## In re LITTLE RIVER LUMBER CO.

(District Court, W. D. Arkansas, Texarkana Division. March 16, 1899.)

1. BANKRUPTCY—PREFERENCES.

Where a solvent corporation pledges and delivers to two of its stockholders policies of insurance on its property, with a clause in such policies making any loss thereunder payable to such stockholders "as their interest may appear," as collateral security for loans made by them to the corporation to enable it to enlarge its business, such pledge does not constitute a preference in favor of those creditors, within the meaning of the bankruptcy act, although the policies expired and were renewed, without any new agreement as to the pledge of them, at a time when the corporation was insolvent, and within four months before the filing of a petition in bankruptcy against it; and a loss having occurred before the adjudication in bankruptcy, and the creditors having received the proceeds of the policies, they will not be required to surrender the same, but may prove their claims against the corporation for the balance of the debt.

2. STATUTE OF FRAUDS—PART PERFORMANCE.

A parol agreement between a corporation and one of its stockholders, by which the former agrees to pledge to the latter policies of insurance on its buildings as collateral security for advances to be made to enable it to enlarge its business, executed by the delivery of the policies and the furnishing of the sum agreed, is not within the statute of frauds, requiring written evidence of a contract not to be performed within a year; being saved by part performance.

3. SAME—FRAUDULENT CONVEYANCES.

A contract by which a corporation pledges to one of its stockholders policies of insurance on its buildings as collateral security for advances to be made to enable it to enlarge its business is not within a statute (Sand. & H. Dig. Ark. § 3472) providing that "every conveyance or assignment of any estate or interest in lands, or in goods and chattels, or things in action, or of any rents issuing therefrom, and every charge upon lands, goods, or things in action or upon the rents and profits thereof * * * made with intent to hinder, delay, or defraud creditors," shall be void, as policies of insurance do not fall within any of the classes of property enumerated.

In Bankruptcy. On exceptions to the allowance of the claim of O'Dwyer & Ahern, proving creditors.

The Little River Lumber Company is a corporation organized under the law of Arkansas. O'Dwyer & Ahern are merchants and partners doing business at Texarkana, Ark. . They were both stockholders of the Little River Lumber Company, and owned a large majority of the stock. In 1897 O'Dwyer was treasurer. In 1898 Ahern became president, and O'Dwyer continued as treasurer. In the fall of 1897, about October, the Little River Lumber Company, at a meeting of the stockholders, concluded to enlarge its business by running the mill on full time. It was solvent at that time, but to carry out the scheme to enlarge its business it required money. It had no means of raising it, except through the assistance of O'Dwyer & Ahern. It was accordingly agreed by the company and O'Dwyer & Ahern that the company should insert in all its insurance policies the usual clause, making the insurance "payable to O'Dwyer & Ahern as their interest might appear," and deliver them to O'Dwyer & Ahern as collateral security for any advances they might make,

and also to secure them for guarantying the Texarkana National Bank for any moneys advanced by it to the Little River Lumber Company. This agreement was in parol, and was carried out. Accordingly the business was enlarged as contemplated. The company bought large bills of goods from O'Dwyer & Ahern, and drew large sums of money from the Texarkana Bank. During the year 1898, as the old policies expired, new policies were taken out, containing the "loss-payment clause" as before, and delivered to O'Dwyer & Ahern, who continued to guaranty the bank for advances, and to sell goods to the company. On December 29, 1898, the mill burned. At the time it burned, the company was insolvent, and had been since the spring of 1898, a few months after the agreement was entered into. At the time of the fire the company owed O'Dwyer & Ahern for advances made by the bank, and guarantied or taken up by them, and for goods sold, $18,511.90, and held insurance policies for $11,950, under the parol agreement referred to. This parol agreement was never expressly renewed, but the parties thereto continued the original arrangement, as stated, up to the fire, in December, 1898. On January 11, 1899, a petition in involuntary bankruptcy was filed against the Little River Lumber Company, and on the 14th day of January. 1899, it was adjudged a bankrupt. O'Dwyer & Ahern now offer to prove up claim against the bankrupt corporation for the full amount of their claim, less the amount of insurance policies. The referee held that they could not prove up their claim until they surrendered their policies. The case is before the judge for review, upon the application of O'Dwyer & Ahern.

Williams & Arnold, for proving creditors.
Kirby & Carter, for opposing creditors.

ROGERS, District Judge (after stating the facts). The question is whether the creditors should be compelled to surrender the insurance policies before they are allowed to prove up their claim. Or, to put it in another form, have they received a preference, within the meaning of the bankrupt law, and therefore not entitled to prove their claim until they surrender the policies, or the proceeds thereof, which in this case constitutes, if at all, the preference? It is important to understand the nature of the contract between the parties. It is settled law that O'Dwyer & Ahern acquired no interest whatever in the policies by reason of what is called the "loss-payment clause," for the reason that it does not appear that they had any insurable interest in the property covered by the policies. The law is believed to be settled in this country and in England that the assured must have an interest in the thing insured, and that, if he has no interest in the property insured when it is destroyed, he is not injured by the destruction, and therefore is not entitled to recover. Bibend v. Insurance Co., 30 Cal. 79, and cases there cited. I do not stop to inquire whether a mere stockholder in an insolvent corporation has such an interest in the property of the corporation as is insurable. I pass both these questions, to look further into the nature of the agreement; for it is evident that while both parties, no doubt, relied, at the time the agreement was made, on the "loss-payment clause," they also looked beyond that, because they agreed that the policies should be delivered to O'Dwyer & Ahern. Delivery was not necessary at all, if the "loss-payment clause" was available to them. So far as that clause was concerned, possession of the policies was wholly unimportant. The clause spoke for itself, and gave the insurance companies notice as to whom the payment should be made. These policies, by the agreement, were to be

delivered, and they were delivered, in the beginning, before the moneys or credits were extended, and afterwards, when renewed, immediately upon the renewal. From this it may be fairly inferred that the original agreement was by both parties regarded as in force when the renewals were made. What was the effect of this agreement? It simply pledged the policies as collateral for the moneys and credits given. It was not a sale of the policies. They were at all times the property of the lumber company, and it had only to pay what it owed O'Dwyer & Ahern, under the agreement, to be entitled to their possession. True, after the fire, the company, by its officers, formally assigned the policies to O'Dwyer & Ahern,—as O'Dwyer says, to facilitate their collection; but if this assignment was void, under the bankrupt law, it did not deprive O'Dwyer & Ahern of the rights vested in them by the pledge. Prior to the fire these policies were not assets, like notes, mortgages, and other choses in action, to which creditors could look for security. Indeed, the company could not collect them. There had been no loss, and their collection depended on the loss. When the loss did occur, O'Dwyer & Ahern held them as collateral, and equity, eo instanti, assigns the proceeds to them, because they held the policies under the pledge. Cromwell v. Insurance Co., 44 N. Y. 42. In Bibend v. Insurance Co., 30 Cal. 86, the court said:

"Courts of equity are in the habit of giving effect to assignments of trusts and possibilities of trusts, and contingent interests and expectancies, whether they are in real estate or in personal property, as well as to assignments of choses in action. Contingent rights and interests are not ordinarily assignable at law, but they are in equity. Assignments of such rights and interests, in being, are upheld and enforced by courts of equity. And, more than this, these courts support and give effect to assignments of 'things which have no present actual or potential existence, but rest in mere possibility,—not, indeed, as a present, positive transfer, operative in præsenti, for that can only be done of a thing in esse, but as a present contract, to take effect and attach as soon as the thing comes in esse.' 2 Story, Eq. Jur. § 1040: Mitchell v. Winslow, 2 Story, 638, 644, Fed. Cas. No. 9,673. In Mitchell v. Winslow, Mr. Justice Story cites many authorities supporting this doctrine, and refers particularly to the opinion of Vice Chancellor Wigram in Langton v. Horton, 1 Hare, 549, as exceedingly cogent in its reasoning and satisfactory in its conclusions, and he then says: 'It seems to me a clear result of all the authorities that wherever the parties, by their contract, intend to create a positive lien or charge either upon real or personal property, whether then owned by the assignor or contractor or not, or, if personal property, whether it is then in esse or not, it attaches in equity as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto, against the latter, and all persons asserting a claim thereto under him, either voluntarily, or with notice, or in bankruptcy.' The case of Field v. Mayor, etc., 6 N. Y. 186, is in support of the cases already mentioned, and is referred to in Pierce v. Robinson, 13 Cal. 123, as declaring the settled doctrine of equity on the subject."

Is the equitable assignment thus made, of the proceeds of a policy thus pledged, more than four months before bankruptcy, in violation of the bankrupt act? If so, of what provision? The referee was of opinion that the transaction was in violation of paragraph b of section 3, which is as follows:

"A petition may be filed against a person who is insolvent and who has committed an act of bankruptcy within four months after the commission of such act. Such time shall not expire until four months after (1) the date of the

recording or registering of the transfer or assignment when the act consists in having made a transfer of any of his property with intent to hinder, delay. or defraud his creditors *or for the purpose of giving a preference as hereinbefore provided*, or a general assignment for the benefit of his creditors, if 1 y law such recording or registering is required or permitted, *or, if it is not, from the date when the beneficiary takes notorious, exclusive, or continuous possession of the property unless the petitioning creditors have received actual notice of such transfer or assignment."*

The referee comments on this paragraph as follows:

"In order to avoid the charge of preference, as made, and to take the transaction from under the jurisdiction of the bankrupt law, the preferred creditor must have had no knowledge of the insolvent condition of the bankrupt; or, where recording or registering is neither required nor permitted, there must have been, somehow or somewhere, in some definite shape, form, or manner, actual notice to the creditors of such transfer or assignment of the property four months before the filing of the petition in bankruptcy, in order that the period allowed after actual notice within which to file the petition has had time to expire. The time of actual notice of the transfer of the property in this case begins to run after the fire, in January, 1899, and within the statutory period of four months required before the filing of the petition. Therefore the act of preference charged against the firm of O'Dwyer & Ahern, and admitted to be true by that firm, and also by the Little River Lumber Company, is clearly within the provisions of section 3, par. b, of the bankrupt law."

To this I cannot agree. The parts of the section relied on by the referee are the parts italicized in the quotation supra. In the first place, these insurance policies were not property, within the meaning of the bankrupt law. They were mere contracts to indemnify the assured in the event there was a loss by fire. The assured could not collect them, unless there was a loss by fire. They were not an asset to which creditors could look for any security until a loss had occurred. Stout v. Milling Co., 13 Fed. 804. They were, however, assignable in equity, and, before the loss, had been hypothecated to O'Dwyer & Ahern as collateral. But, if the policies were property, in order to contravene the section referred to they must have been transferred "with intent to prefer such creditor over his other creditors." Bankr. Law, § 3, pt. 2. In my opinion, there is an entire absence of any evidence to establish any such intent at the time the policies were pledged or renewed. Moreover, the company must have been insolvent when pledge was made. Id. When the original pledge was made, the evidence shows, the company was solvent. It was insolvent when most of the policies were renewed, and most of them were renewed more than four months prior to the bankruptcy of the company. But I am of opinion that the renewals do not affect the question at all, for the reason that the policies were not property, not an asset to which creditors at that time could look for security, and because I think the renewals relate back to the original agreement made in October, 1897. The renewals were mere substitutions for the originals.

The referee was of opinion that the notice referred to in clause 1, par. b, § 3, Bankr. Law, began to run after the fire. To this I cannot agree, even if the policies were treated as property. The transfer of these policies was not required by any law to be recorded or registered in order to give notice. In this case the notice began

when the beneficiary took either "notorious, exclusive or continuous possession," unless the creditors had "actual notice of such transfer or assignment prior thereto." The evidence does not show that "notorious" possession was taken, or that the creditors had "actual notice" before the fire of the transfer of the policies; but it is conclusive that O'Dwyer & Ahern had both "exclusive and continuous possession" of them at all times after they were pledged, and, except as to the last policies renewed, this occurred more than four months before the petition in bankruptcy was filed.

But suppose the court is in error on these questions. The bankrupt law does not require an insolvent to cease business. It does not prohibit him from borrowing money and securing the borrower, or from buying goods and securing the seller. What it forbids is the giving of a preference to an existing or prior creditor, or securing a previous debt. In this case O'Dwyer & Ahern took the security, and then furnished the goods and money. This did not diminish the company's assets, or injure other creditors. The effect of the transaction was that O'Dwyer & Ahern took these policies, which were not at the time assets on which the general creditors could rely for their security, and the value of which, at best, depended on the loss by fire, and in consideration thereof increased, by the amount of the goods sold and money advanced, the real assets to which the general creditors could look as security for their debts. This was certainly no fraud on the estate, and none on the other creditors. Tiffany v. Institution, 18 Wall. 375. Sections 60 and 67 of the bankrupt law both have reference also to preferences, but there is nothing in either to change the result. I conclude that nothing done by the company or the creditor prior to the fire was forbidden by the bankrupt law.

It is insisted that the transaction is prohibited by section 3469, Sand. & H. Dig., which is as follows:

"Sixth. To charge any person upon any contract, promise or agreement that is not to be performed within one year from the making thereof, unless the agreement, promise or contract upon which such action shall be brought, or some memorandum or note thereof, shall be made in writing, and signed by the party to be charged therewith, or signed by some other person by him thereunto properly authorized."

The referee correctly decided that the transaction was taken out of the provisions of that statute by part performance.

It is also contended that it is within section 3472, Sand. & H. Dig. (Statute of Frauds), which is as follows:

"Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods and chattels, or things in action, or of any rents issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, and every bond, suit, judgment, decree or execution, made or contrived with the intent to hinder, delay or defraud creditors, or other persons, of their lawful actions, damages, forfeitures, debts or demands, as against creditors and purchasers prior and subsequent, shall be void."

I am of the opinion that this section has no application to a contract of the nature of the one in question, for the reason that the policies of insurance do not fall within any of the class of property

named in the statute, and for the additional reason that there is no evidence that they were pledged with the intent condemned by that statute. Bibend v. Insurance Co., 30 Cal. 88.

Other questions of fact and law have been discussed in the elaborate briefs of counsel, but I do not regard them as affecting the result, and therefore do not notice them here.

Deducting $11,548.49, the gross amount collected by O'Dwyer & Ahern and the bank on the insurance policies, from the claim of O'Dwyer & Ahern, leaves a balance of $7,949.74, for which amount the claim of O'Dwyer & Ahern is allowed, and an order will be entered accordingly.