## In re DURHAM.

(District Court, D. Maryland. March 14, 1902.)

**1. BANKRUPTCY—JURISDICTION TO DETERMINE VALIDITY OF MORTGAGE—CONSENT OF MORTGAGEE.**

A creditor of a bankrupt, who holds chattel mortgages, and who, in response to a petition by other creditors, asking that its mortgages be set aside as illegal preferences, asked and obtained further time to plead, and thereafter answered the petition, asserting the validity of its mortgages, and asking that its claim be allowed and paid from the proceeds of the mortgaged property in the hands of the trustee, thereby consented that its rights might be adjudicated by the court of bankruptcy, and cannot, for the first time, challenge the jurisdiction of such court after the issues have been referred and testimony taken by the referee.

**2. SAME—LIENS—VALIDITY OF CHATTEL MORTGAGES.**

A bankrupt, before the filing of his petition, was a country merchant, and engaged in the canning of tomatoes, which required during the canning season a large outlay of cash in the purchase of tomatoes and cans. By arrangement with a bank the latter advanced the sums required, taking up the drafts attached to bills of lading for cans, and holding such bills until mortgage bills of sale were executed upon the canned product to secure the advances made, and further advances then made or to be made for the purchase of materials. These mortgages were properly recorded. *Held*, that such mortgage bills of sale created valid liens, which, under Bankr. Act 1898, § 67d, were not affected by the subsequent bankruptcy of the mortgagor.

**3. SAME.**

A parol agreement between the mortgagor and mortgagee that the canned products should be delivered by the mortgagor to a commission house, and be sold by it, and the net proceeds paid to the mortgagee, did not affect the validity of the mortgages, or constitute a transfer with the intent and purpose to hinder and delay creditors, within the meaning of Nat. Bankr. Act 1898, § 67e.

**4. CHATTEL MORTGAGES—VALIDITY—SUFFICIENCY OF DESCRIPTION.**

A series of chattel mortgages executed at short intervals, and in effect as a part of the same transaction to secure advances made by the mortgagee to enable the mortgagor to conduct a canning business, and covering the product of such business, are not invalid, under the law of Maryland, for insufficiency of description, although at the date of the first the goods mortgaged were in part to be yet acquired, where they had all been acquired when the last was executed.

In Bankruptcy. Proceeding to set aside certain chattel mortgages from the bankrupt to the Harford National Bank of Bel Air, Md.

John L. G. Lee, W. Irvine Cross, and Harry S. Carver, for E. Savage Shure, John S. Wallis, and other creditors.

Stevenson A. Williams and David G. McIntosh, for the Harford National Bank of Bel Air, Md.

MORRIS, District Judge. The bankrupt, John J. Durham, filed his voluntary petition December 13, 1899, and was duly adjudicated. On April 19, 1900, E. Savage Shure and John S. Wallis, and subsequently other creditors of the bankrupt, filed their petitions, asking that certain bills of sale of the bankrupt's property made by him to the Harford National Bank of Bel Air four months preceding the bankrupt's application be set aside as illegal preferences, and made to hinder, delay, and defraud creditors. An order on the petition re-

quired the Harford National Bank of Bel Air to answer and show cause on or before May 5, 1900. On May 4, 1900, the Harford National Bank of Bel Air filed its petition, asking to have the time for filing its answer extended until May 15th. On May 15th the Bank filed its answer, under oath, to all the allegations of the petition, and, proffering itself ready to furnish such other detailed accounts of its transactions with the bankrupt as might be right and proper, claimed that it was entitled to have the lien of its several mortgage bills of sale preserved, maintained, and enforced, "and its claim therefor allowed out of the proceeds of sale of the property covered thereby now in the hands of the permanent trustee of said Durham." On July 5, 1900, the petition and answer were, by order of the court, referred to the referee to take testimony and report to the court. On July 11, 1900, Thomas H. Robinson, who had been appointed trustee of the bankrupt's estate, and on whom a copy of the creditors' petition had been served, filed his petition, stating that from the information obtained by him he was unable to determine whether the allegations in the petition could be sustained or not, and that for the purpose of bringing the matter properly before this court, and having the allegations investigated, he charged that the bills of sale held by the bank did create illegal preferences, and should be set aside. On July 24, 1900, and after the taking of testimony had been commenced, the bank filed its petition, asking leave to withdraw its answer, and to file a demurrer setting up want of jurisdiction in the court to hear and determine the validity of the bills of sale. This leave was not granted, and the parties proceeded with the taking of testimony.

I am of opinion that the objection to the court assuming jurisdiction came too late. The bank, by its application for further time to answer, and then by answering and submitting to the jurisdiction of the bankrupt court, and asking that its lien be sustained, and its claim allowed out of the proceeds of property in the hands of the trustee in bankruptcy, fully consented that the issues raised by the petition and answer should be heard and determined by the bankrupt court as part of the proceedings in bankruptcy, and as a controversy in relation to the estate of the bankrupt. The Harford National Bank was not a stranger to these proceedings, for on the day that Durham filed his petition, and was adjudicated a bankrupt, it filed its petition stating that it was a creditor for $15,173.28, and asked that receivers be appointed to take possession of all the bankrupt's goods, and that a restraining order issue enjoining all persons from interfering with the bankrupt's property. Upon its petition the court granted the relief asked for. It seems clear, therefore, that the bank made itself a party to these proceedings, asked substantial relief, and consented to the determination of the controversy as to its claim of lien upon certain assets of the bankrupt by this court of bankruptcy.

There were five mortgage bills of sale duly recorded made by Durham to the bank in August, September, and October, 1899, the total of the sums intended to be secured amounting to $29,250. Of these amounts it is admitted by the bank that the sum of $5,000, mentioned in the first bill of sale, was an antecedent debt, carried over from the previous season, for which they held the bankrupt's note, with two in-

dorsers. All the other amounts are claimed by the bank to have been made up either of an advance of money made at the time the bill of sale was delivered to it, or for an advance then agreed to be made and subsequently advanced.

In considering whether this contention has been satisfactorily established by proof, the surrounding facts should be borne in mind. Durham carried on the business of a country storekeeper, and had for several years been engaged during the canning season in canning tomatoes in Harford county, Md. In the season of 1899 he increased his canning business, and had made contracts for cans and other material which had to be paid for in cash, and had made contracts for tomatoes to be grown for him, and contracts for filling empty cans to be provided by him. All these contracts involved the paying out of large sums of cash, the cans not being deliverable until the drafts attached to the bills of lading for them were paid, and other parties having a possessory lien on the cans when filled. No money could be realized from sale of the canned goods until near the end of the season, when they were ready for shipment to purchasers at a distance. It is plainly a case where a large advance upon the cans and other material as delivered to Durham, and upon the goods when packed, was a usual and legitimate transaction, and, for a country storekeeper of small capital, unavoidable. The business of the bank was to loan money, and to loan it securely, and not to put it at the risk of the business enterprises of its customers, as do the vendors of merchandise. The president of the bank, Mr. Williams, testifies that Durham never was allowed to overdraw, or to have money from the bank further than it had securities in hand. This was often by the retention of the bills of lading for cans, which were shipped to Durham in car-load lots, after the bank had paid the drafts for the price of the cans attached to the bills of lading. This security was held, and the cans not delivered by the bank to Durham until a mortgage bill of sale was executed. Durham kept his account at the bank, and it is shown that the sums paid for him by the bank made up of drafts, notes, and checks in the prosecution of his business amounted from July to the end of December, 1899, to $77,521.03. The taking of security by holding title to the goods paid for by the money advanced by the bank, which could not be paid back until the product of the season's packing was sold, is in harmony with the transaction, and with the custom of banks and bankers. In the city it would be done by pledging warehouse receipts, and, where goods are scattered in country canning factories, by mortgage bills of sale. I am satisfied from the testimony that, except as to $5,000, secured by the first bill of sale, the bills of sale were taken by the bank to secure present, and not antecedent, advances, and that the money was bona fide advanced to enable Durham to pay the necessary outlays of his canning business, and procure the necessary material and labor to prosecute it. After he had made his contracts for the canning season of 1899, his only hope of escaping disaster was to obtain the funds required to pay for the cans and other material necessary to prosecute the business. These payments tended to increase his estate in so far as the materials purchased increased his assets and facilitated his business. There was nothing secret about the bank's security.

The several bills of sale were all promptly recorded, according to the Maryland law, on the day they were executed, and every one dealing with Durham was affected with notice of their contents. Their meaning and purpose was obvious and unmistakable, viz. that the bank was furnishing Durham with the funds required to carry on his canning business at the season of its greatest activity, and was taking mortgage bills of sale on the material thus paid for and on the product of the canning factories, almost from week to week, to secure its advances. That these advances were bona fide transactions intended to aid Durham in successfully prosecuting the season's canning business, and, if possible, to pay off the debts contracted in it, I discover no sufficient reason to doubt. It is quite apparent that the canning business is often done on a narrow margin of profit, and that a few cents per dozen difference in the price at which the canned goods are finally sold, or at which the empty cans are bought, determines the success or failure of the season's business. It turned out that the price at which Durham's goods of that season were sold was very low and unprofitable. When the bank, after October 23d, refused further accommodation to Durham, and he could get no more money from that source, and he was unable to receive and pay for many thousand bushels of tomatoes which had been grown for him, and they began to rot in the fields. then his creditors became clamorous, and his application in bankruptcy followed on December 13th. Before the application, the bank, finding that Durham's condition was hopeless, proceeded to get possession, as far as possible, of all the canned goods covered by its bills of sale,—about 15,000 cases,—and made sale of the greater portion of them.

By section 67d of the national bankruptcy act of 1898, it is provided:

"Liens given or accepted in good faith and not in contemplation of or in fraud of this act, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall not be affected by this act."

The cases interpreting the foregoing and similar provisions in bankrupt laws are carefully cited in the note to In re Little River Lumber Co., 1 Am. Bankr. R. 483, 92 Fed. 585, and it is not, therefore, necessary to refer to them here. They hold that pledges to secure money loaned at the time are valid; that an exchange of a security validly held for a new security, the old one being released, is not a preference; that a fair exchange of values may be made at any time notwithstanding insolvency; that an insolvent is not bound to abandon all dealing with his property, provided he does not give preference to antecedent debts, and does not so deal with it as to evidence a purpose to defraud or delay his creditors, and that preferences can only arise in case of antecedent debts. See, also, In re Wolf (D. C.) 98 Fed. 84; In re Davidson (D. C.) 109 Fed. 882. It is, however, contended by the petitioners that, notwithstanding it may be true that the mortgage bills of sale were made for a valid, present consideration, they were void under section 67e, which enacts that all conveyances, transfers, assignments, or incumbrances given by a person adjudged a bankrupt within four months prior to the filing of the petition, with intent and purpose on his part to hinder, delay, or defraud his creditors, or any

of them, shall be null and void as against the creditors of such debtors, except as to purchasers in good faith and for a present consideration. Bank v. Bruce, 48 C. C. A. 236, 109 Fed. 69.

It is urged that, although the bills of sale were given by the bankrupt as the consideration of obtaining advances from the bank to be used in his business, yet by reason of the manner in which the property mortgaged was dealt with it must be held that Durham's purpose was to hinder and delay his other creditors. There was no agreement in the bills of sale allowing the mortgagee to dispose of the property, but it is proved that by an agreement entered into in September Messrs. Smith, Rouse & Webster, who were commission merchants at Bel Air for the sale of canned goods, and were also dealers in canners' supplies, were authorized to make sale of the canned tomatoes; and Durham agreed that, as soon as they were packed and labeled, he would ship them, according to the instructions of Smith, Rouse & Webster, to the purchasers procured by them, and allow Smith, Rouse & Webster to bill the goods in their own names, and collect the proceeds of the sales. Smith, Rouse & Webster agreed to guaranty the payment of the sales made by them, and to notify the Harford National Bank of each shipment of goods as soon as they received the bills of lading; and further agreed, after deducting their own charges and advances, to pay over the balance to the bank, which claimed the goods under the bills of sale. This was not an agreement allowing the mortgagor to sell the goods and appropriate the money received to his own use, but was an agreement by which the proceeds of the goods were applied to the payment of the mortgage debt, the sale being made in the customary manner by commission merchants, through whom Durham usually purchased his cans and sold his canned goods. Edelhoff v. Manufacturing Co., 86 Md. 595–612, 39 Atl. 314. No inference of purpose to delay or hinder creditors can be drawn from this agreement.

It is further urged that these bills of sale should be held invalid because the description of the goods intended to be conveyed is not sufficiently definite. I think, at least so far as the canned goods are concerned, the description is sufficient to gratify the requirements of the Maryland statute. There were five mortgage bills of sale, viz., August 25, 1899, for $5,000 antecedent debt and $3,000 present consideration; September 5, 1899, for $11,000; September 21, 1899, for $4,250; September 29, 1899, for $3,000; October 23, 1899, for $3,000. It was an almost continuous transaction, and although as to the earlier one the goods mentioned were in part to be after-acquired, they had been all acquired at the date of the latest bill of sale. The description of the personal property conveyed by a bill of sale required by the Maryland Code (article 21, § 41) is only a general description by its location, ownership, and general characteristics, and parol evidence is admissible to show the particular articles included within the general words of the description. Jones, Chat. Mortg. § 56.

The prayer of the petition is that the said several bills of sale may be declared null and void and set aside, and the proceeds arising from the sale of the property described therein distributed under the orders and directions of this court amongst the creditors of said bankrupt

equally. This prayer, except as to the antecedent debt of $5,000, attempted to be secured by the mortgage bill of sale of August 25, 1899, is denied.