**In the Matter of HYGRADE ENVELOPE CORP., Bankrupt.**

**No. 63 B 105.**

United States District Court
E. D. New York.

Aug. 8, 1967.

Popper & Popper, New York City, for trustee in bankruptcy; Abraham Popper, New York City, of counsel.

Louis P. Rosenberg, Brooklyn, N. Y., for Gibraltar Factors Corp.

## OPINION

WEINSTEIN, District Judge.

Review is sought of the determination of the Referee in Bankruptcy following remand by the Court of Appeals for further findings and conclusions. See In re Hygrade Envelope Corp., 366 F.2d 584, 589 (2d Cir. 1966). The question posed is whether the $101,000 proceeds of an insurance policy—on the life of Jack Wohl, vice-president, general manager and "key man" of the bankrupt, Hygrade —assigned by Hygrade to Gibraltar Factors Corp. at a time when Hygrade was known to be insolvent, is a voidable preference. For the reasons indicated below, this Court concludes, as did the Referee, that Gibraltar may retain the proceeds.

## I. RELATIONSHIP OF HYGRADE AND GIBRALTAR

For a period of some years Hygrade, an "under-capitalized" firm, was financed by Gibraltar. The parties did not have an "oldline" or classical factoring relationship in which the factor purchases accounts outright and assumes the risk of loss. Steiner & Shapiro, Money and Banking, p. 237 (3rd Ed. 1953); Guthmann & Dougall, Corporate Financial Policy, pp. 470–473 (4th Ed. 1962). Rather, the financing arrangement involved loans of up to 75% of the net amount of the accounts receivable secured by the accounts, and loans secured by inventory liens. Such loans on inventory and other assets are part of the general services offered by modern factors. Phelps, The Role of Factoring in Modern Business Finance, p. 16 (1956); Bradley, Fundamentals of Corporation Financing, pp. 426–427 (1959).

At the initiation of their relationship, Gibraltar had required Hygrade to take out and assign to it insurance on Wohl's life in the sum of $100,000. Because one of the policies was a reducing one, it had a face value of only $72,000 in November of 1962.

On November 26, 1962, Hygrade was indebted to Gibraltar for $385,000. This debt was well in excess of the reliable security then held by Gibraltar. Gibral--

tar held security assignments of $61,000 in chattel mortgages and $273,000 in accounts receivable. Some $144,000 of the assigned accounts were over 120 days old and considered by a court-appointed auditor to be "doubtful." An additional $62,000 of security in a fire loss claim and in inventory was available to pay loans on the accounts receivable because of cross-collateral agreements.

A few days before November 26, 1962, Gibraltar, in a routine spot check of selected accounts, discovered that Hygrade's second largest account indicated a "discrepancy." Confronted, Wohl revealed that these accounts included "pre-billed" goods not yet ordered.

At this point, Gibraltar sought further protection. It demanded an additional $100,000 insurance policy on the life of Wohl. Hygrade, not wishing to pay an estimated $1,000 necessary to purchase a new $100,000 policy on Wohl's life, assigned to Gibraltar, on November 26, 1962, such a policy owned by it with a cash surrender value of $393.

From November 26, 1962 to February 8, 1967, the date Hygrade was adjudicated a bankrupt, Gibraltar continued to finance Hygrade. The loans and security assignments—listed below—indicate a narrower margin of security than the "up to 75% of the Net Amount of the Accounts assigned as security for each loan" provided by the Accounts Receivable Agreement. There was an obvious reliance on the continued managerial skill of Wohl, at least until he died "suddenly" on December 5, 1962 beneath the wheels of a train.

Dealings Between Hygrade & Gibraltar 11/26/62–2/8/63

|  | Security Taken | Loans Made |
|---|---|---|
| 11/26/62 | Insurance policy (cash surrender value $393; proceeds on death $101,000) | |
|  | Chattel Mortgage—$15,000 | $12,500 |
| 11/27/62 | Accounts Receivable—$5,951.12 | |
|  | Chattel Mortgage—$8,500 | 6,200 |
| 11/28/62 |  | 2,000 |
| 11/29/62 | Accounts Receivable—$8,042.49 | 4,000 |
| 12/1/62 | Accounts Receivable—$8,038.23 | 13,000 |
| 12/5/62 | (Death of Wohl) | |
| 12/17/62 | Accounts Receivable—$12,426.65 | 8,484 |
| 12/21/62 | Accounts Recievable—$3,590.03 | 2,700 |
| 1/2/63 | Accounts Receivable—$2,711.14 | 2,033 |
| 1/23/63 | (petition in bankruptcy filed) | 1,500 |
| Total | $64,259.66 (exclusive of life insurance policy) | $52,417 |

During this two-month period there were substantial collections against assigned accounts receivable so that, despite additional loans, the net debt was reduced to $210,000. After collection of $101,000 on the insurance policy in question and other adjustments, there is still a deficit of some $50,000 in the account due from Hygrade to Gibraltar.

## II. LITIGATION INVOLVING PROCEEDS OF POLICY

The trustee in bankruptcy counterclaimed for the proceeds of the insurance policy as a voidable preference. The Referee, finding a failure of proof that "at the time of the assignment of the insurance policy Gibraltar knew or had reason-

able cause to believe that the bankrupt was insolvent," denied relief. Decision of Referee, September 30, 1965. This order was confirmed by Bruchhausen, J. Unpublished opinion, December 13, 1965.

The Court of Appeals reversed because "the result does not jibe with the applicable rule of law" and "was infected by a misreading of the record." In re Hygrade Envelope Corp., 366 F.2d 584, 588–589 (2d Cir. 1966). The case was remanded to the Referee to determine the following issues:

" * * * whether the transfer was for or on account of an antecedent debt, § 60a(1), and whether, if the transfer was preferential, Gibraltar is entitled to a set off under § 60c. He may also consider the claim, first advanced in Gibraltar's petition for rehearing, that the trustee is not entitled to recover because the insurance policy was exempt property under New York Insurance Law § 166(1) if that point remains relevant in the light of his other findings and conclusions." Id. at 589–90.

Upon remand, the Referee concluded "as a matter of law that the insurance policy in question is exempt property covered by Sec. 166(1) of the Insurance Law of the State of New York [McKinney's Consol.Laws, c. 28] and that the trustee cannot void the assignment thereof as a voidable preference under any of the applicable sections of the Bankruptcy Act." Referee's Decision, April 17, 1967, p. 18. The Referee made the following additional findings—relevant only if his finding regarding the exempt status of the insurance policy is reversed: "the transfer of the insurance policy, from Hygrade to Gibraltar, was a preference within the purview of Section 60B of the Bankruptcy Act and was not made for a new and present consideration but was additional security for a past indebtedness." Id. at p. 19. The Referee further concluded that inasmuch as "Gibraltar, had security of another kind for the additional advances and that the additional advances were not made in good faith * * * I conclude as a matter of law

that Gibraltar is not entitled to a set-off against the claim of the trustee to the proceeds of the insurance." Id. at p. 27.

## III. EXEMPT STATUS OF INSURANCE POLICY

■ The Federal Bankruptcy Act itself contains no exemptions for the property of bankrupts. Instead, section 6 (11 U.S.C. § 24) grants "bankrupts * * * the exemptions which are prescribed by the laws of the United States or by the State laws in force at the time of the filing of the petition." Since federally created exemptions are not relevant here, the "Bankruptcy Law * * * makes the state laws * * * the measure of the right to exemptions" of the bankrupt. White v. Stump, 266 U.S. 310, 312, 45 S. Ct. 103, 69 L.Ed. 301 (1924). "Whether the exemption claimed * * * should or should not have been allowed must, therefore, be determined by the laws of [the] state." Turner v. Bovee, 92 F.2d 791, 793 (9th Cir. 1937). But, of course, even if the state law permits the exemption, it also must be one allowable under the federal law.

Paragraph 1 of section 166 of the Insurance Law of New York grants an assignee [Gibraltar] of a life insurance policy the "proceeds or avails" [$101,-000] "as against" a trustee in bankruptcy of the "person effecting the insurance" [Hygrade]. It provides as follows:

"§ 166. *Exemption of proceeds and avails of certain insurance and annuity contracts.*

1. If any policy of insurance has been or shall be effected by any person on his own life in favor of a third person beneficiary, or made payable, by assignment, change of beneficiary or otherwise, to a third person, such third person beneficiary, assignee or payee shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person effecting the insurance. If any policy of insurance has been or shall be effected by any person upon

the life of another person in favor. of the person effecting the same or made payable, by assignment, change of beneficiary or otherwise, to such person, the latter shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person insured; if the person effecting such insurance shall be the wife of the insured, she shall be entitled to the proceeds and avails of such policy as against her own creditors, trustees in bankruptcy and receivers in state and federal courts. *If any policy of insurance has been or shall be effected by any person on the life of another person in favor of a third person beneficiary, or made payable, by assignment, change of beneficiary or otherwise, to a third person, such third person beneficiary, assignee or payee shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person insured and of the person effecting the insurance.* * * * The person insured in a case under the first sentence of this subsection or the person effecting the insurance other than the wife of the insured in a case under the second sentence, and the person effecting the insurance under the third sentence thereof, or the executor or administrator of any such persons, or a person entitled to the proceeds or avails of such policy in trust for such persons shall not be deemed a third person beneficiary, assignee or payee. * * *" (Emphasis supplied.)

The exemption provided by state law does not apply in this case for two independent and sufficient reasons. First, the Bankruptcy Act requires that the property be exempt when in Hygrade's hands; under the state statute it is exempt, if at all, only in Gibraltar's. Second, under state law, the exemption is not available to a corporation.

## A. EXEMPTION NOT POSSIBLE UNDER FEDERAL LAW

■■ Exemptions under state law apply "[o]nly in such event" as "an exemption to the bankrupt within the provision of section 6 of the Bankruptcy Law" is allowed. In re Messinger, 29 F.2d 158, 160, 68 A.L.R. 1205 (2d Cir. 1928), cert. denied sub nom., 279 U.S. 855, 49 S.Ct. 351, 73 L.Ed. 996 (1928). Section 6 allows exemptions solely to "bankrupts." See 3 Remington on Bankruptcy, § 1281 (1956). Three possible exceptions exist to this federal rule. "An exemption may be claimed by the bankrupt's wife and children, when the state law permits it, as the intention of the law is as much to protect them as the husband." 1 Collier on Bankruptcy, § 6.09, pp. 828-9 (14th Ed. 1966). Partners may be able to claim exemptions in partnership assets. Id. at p. 832. Lastly, an assignee of property exempt in the hands of the bankrupt may retain it even if it otherwise would be a preference. See Rutledge v. Johansen, 270 F.2d 881, 883 (10th Cir. 1959) (transfer by bankrupt of exempt homestead); In re Rubin, 29 F. Supp. 416, 418 (S.D.N.Y.1939) (transfer of exempt insurance proceeds; "The money thus received being exempt, the bankrupt's estate was not diminished and the creditors have sustained no loss").

■ Gibraltar cannot, under federal law, qualify for an exemption in its own right since it is not a bankrupt. And Hygrade, the bankrupt, is not allowed an exemption under the New York Insurance Law. The first sentence of subdivision 1 of section 166 only grants an exemption to persons insuring their own lives—not the circumstance here. The second sentence applies only to creditors of the insured—Wohl's creditors—and his creditors are not claiming the exemption. See, e. g., N.Y. Insurance Law §§ 146, 221–a, 601 ("insured" is the person whose life is covered). The third sentence exempts only third party beneficiaries and Hygrade—which bought the policy—was never the third party beneficiary. Hygrade could not, under Section 166, by effecting an insurance policy

on the life of another receive an exemption against its own creditors.

## B. EXEMPTION NOT GRANTED BY STATE LAW

█ Even if this strict interpretation of the Federal Bankruptcy Act is incorrect, state law does not grant an exemption to corporations such as those in this case. The phrase "person effecting the policy" (Gibraltar), as used in the state statute, means "natural person." In construing "person" in section 166 we look to New York State law.

Section 37 of the New York General Construction Law, McKinney's Consol. Laws, c. 22, defines "person" to include a corporation. But, Section 110 of that Law provides that the definition will not apply if "the context of the language construed * * * indicate[s] that a different meaning or application was intended * * *"

The New York Insurance Law uses the term "person" inconsistently; sometimes "person" obviously includes a corporation, while at other times "person" means only a natural person. Compare, e. g., §§ 146(2) (b), 148 with §§ 110, 118, 165.

The pattern of subdivision 1 of section 166 suggests that "person" does not include a corporation in this provision. The "person" effecting an insurance policy "on his own life" in the first sentence could only be a natural person. In the fifth sentence, reference is made to executors or administrators of the persons effecting the policy; corporations obviously do not qualify. But such mechanical grammatical exercises in statutory construction are seldom reassuring. Much more useful in interpretation is a search for the reason the rule was adopted.

█ The applicable state policy is protection of natural persons against want. "The exemption of a reasonable amount of property necessary to subsistence has long been recognized in this country as justifiable on humanitarian grounds." Baldwin's New York Insurance Law, p. 100 (1939). Cf. Jackson v. Jackson, 194 Misc. 134, 135, 86 N.Y.S.2d 516, 517

(Sup.Ct.1948) (the purpose of "such statutes" is to provide "support and maintenance"). As pointed out in a leading treatise (1 Collier on Bankruptcy, § 6.03 (14th Ed. 1966)):

> "Courts have noted three distinct but related purposes served by exemption statutes: (1) protection of individuals and of families from pauperism during periods of financial difficulty; (2) encouragement for debtor rehabilitation; and (3) shifting of the burdens of social welfare from the community to creditors."

One noted authority has flatly declared that "[c]orporations do not have personal exemptions and the administration of their affairs is correspondingly simplified." MacLachlan, Law of Bankruptcy, p. 422 (1956). Cf. Phillips v. C. Palomo & Sons, 270 F.2d 791, 793 (5th Cir. 1959) (granting exemption to partners; contrasting liberal Texas exemption laws with more restrictive policy in other states).

Legislative history on this provision or its predecessor—former section 55–a—is scant. But it is significant that the only reference to its purpose contained in the bill jacket on file in the Legislative Reference Library in Albany is a comment from an insurance company trade association that "this law will provide real protection to all honest policy holders and their families." See also Insurance Department of New York, Insurance Law Revision of the State of New York Tentative Draft, 1937, p. 184.

While the matter is not free from doubt, the exemption of section 166 is not, this Court holds, available to a corporation. The decision of the Referee on this issue is reversed.

## IV. CONSIDERATION FOR ASSIGNMENT OF INSURANCE POLICY

█ Since Gibraltar is not entitled to an exemption, it is necessary to consider the issue remanded by the Court of Appeals for determination: "whether the transfer was for or on account of an antecedent debt" and, therefore, a voidable preference pursuant to subdivision

(a) of section 60 of the Bankruptcy Law. 11 U.S.C. § 96(a). The essential elements of a voidable preference are: (1) a debtor making or suffering a transfer of its property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt; (4) while insolvent; (5) within four months of bankruptcy; (6) the effect of which transfer will be to enable the creditor to obtain a greater percentage of his debt than other creditors of his class; and (7) the creditor being preferred has knowledge or reasonable cause to believe that the debtor was insolvent. Moran Bros., Inc. v. Yinger, 323 F.2d 699, 701 (10th Cir. 1963); Aulick v. Largent, 295 F.2d 41, 45 (4th Cir. 1961); 3 Collier on Bankruptcy, § 60.02 [1] (14th Ed. 1966). The absence of any one of these factors negates the existence of a voidable preference.

The Court of Appeals found that Gibraltar had reasonable cause to believe that Hygrade was insolvent. In re Hygrade Envelope Corp., 366 F.2d 584, 589 (2d Cir. 1966). There can be no substantial doubt that all other necessary elements of a voidable preference existed, with the exception of antecedent debt—item (3) in the above enumeration.

■ A transaction may be made between a debtor and a creditor even with full knowledge of insolvency provided that the transfer of property by the debtor was not "for or on account of" an antecedent debt. In the instant case, for example, the trustee properly failed to challenge the assignments of accounts receivable made after November 26, 1962, when Hygrade's insolvency became apparent, because it is clear that the advances thereafter made were fair consideration for the accounts received.

■ The reason that all transfers subsequent to knowledge of insolvency are not voidable is obvious. A transfer of the debtor's assets to a creditor after insolvency, it is recognized, may be for "the very purpose of assisting the bankrupt and helping him to extricate himself from the financial difficulties which had beset him, not to defraud, hinder, or delay his creditors." United Pacific Insurance Co. v. United States, 358 F.2d 966, 970 (Ct.Cl.1966). Security given by an insolvent to a creditor which advances funds in the hope that the debtor can continue in business is proper provided the "amount of the collateral was in no case excessive." In re Freeman Cotting Coat, 212 Fed. 548, 550 (D.Mass.1913). Transfers made after the lender had reasonable cause to believe the bankrupt was insolvent are not preferential where the lender paid a "fair" present consideration." Wolf v. Aero Factors Corp., 221 F.2d 291, 292 (2d Cir. 1955). The fact that continued financing might ultimately help collect past debts is not decisive. Cf. Pasadena Investment Co. v. Pasadena Air Products, Inc., 234 F.Supp. 128, 134–135 (S.D.Cal.1964) (overdrawn accounts were not antecedent debt and could represent "fair present consideration" for invoices assigned).

Their agreement did not obligate Gibraltar to continue to loan monies to Hygrade. On November 26, 1962, after the discovery of the "pre-billed" accounts, Gibraltar knew that it was owed more money than it held in security. It also recognized that if it stopped financing Hygrade that client would soon go out of business thereby possibly maximizing losses on accounts receivable. While continued financing might have meant throwing good money after bad, it was possible that the business could be saved, all debts paid, and a valuable client retained. One view of subsequent events was, therefore, that Gibraltar decided to inject new money into the business with the hope of either saving it or of keeping it running long enough to reduce Gibraltar's losses as much as possible. The advances by Gibraltar after Wohl's death on December 5, 1962, may have been of a different kind, made "to assure, if possible, the collection of the accounts receivable." Referee's Decision, April 17, 1967, pp. 25–26.

■ Financing by factors has grown in recent years; they are now one of the major sources of business funds in the United States. See Bradley, Funda-

mentals of Corporation Financing, p. 427 (1959); Popma, A Behind-The-Scenes Look at Factoring, in Readings in Financial Management, p. 337 (Mock Ed. 1964) ("fastest growing form of business finance in the country"). While factors do not provide "a one-shot, distress type of operation," but normally a continuing arrangement (Phelps, The Role of Factoring in Modern Business Finance, p. 18 (1956)), they sometimes supply funds at critical points in the life of a business. When factors overreach to obtain impermissible preferences they must be forced to disgorge. But courts should not draw inferences with excessive reliance on hindsight to discourage such important sources of business capital from exercising their judgment to save concerns on the edge of failure. In the instant case, bankruptcy resulted, but in other cases, continued advances after "insolvency" have saved valuable business enterprises from destruction to the benefit of the creditors and others. The law must consider how reasonable business men might have analyzed the situation before committing their assets in this time of Hygrade's business crisis.

As Gibraltar's vice-president, Herbert Hurwitz testified, after the "quick decision" to continue financing was made, Wohl "would ask us to give him these advances and we had to do a lot of soul searching each time." Due to increasing debts and the self-reducing feature of one of the life insurance policies, the ratio of insurance coverage to debts had been substantially reduced by November, 1962. In view of the good will and executive skill of the business concentrated in the person of Wohl, it was reasonable and sound business practice for Gibraltar to have required insurance on Wohl's life. As one proponent of factoring points out, "We place greater emphasis on people than on the property they own. * * * Funds are granted to individuals on the basis of their individual capacities. This obviously involves a large element of risk." Popma, A Behind-The-Scenes Look at Factoring,

in Readings in Financial Management, p. 337 (Mock Ed. 1964).

■ A clear insurable interest was present. See Harnett & Thornton, Insurable Interest in Property: A Socio-Economic Reevaluation of a Legal Concept, 48 Colum.L.Rev. 1162, 1169 (1948); 2 Appleman, Insurance Law and Practice, § 852, p. 356 (1966). The insurance, while perhaps not in an accounting sense security for new advances, was security, in an economic sense, of the future value of the business as a going concern. It looked ahead, not behind. Embarking upon an open-ended program of financing of uncertain magnitude, particularly after the "pre-billing" affair, it was not unreasonable to demand additional insurance protection of $100,000—particularly where the actual cash surrender value of the policy assigned was only $393—less than 1% of the $52,000 advanced after November 26, 1962.

The testimony before the Referee with respect to the intentions of the parties is naturally somewhat confused and ambiguous since no one was able to ignore the past indebtedness as they negotiated for new financing. Nevertheless, a reading of the full record supports the conclusion that the assignment of the policy was taken as consideration for future financing of a business all hoped would be saved. For example, Hurwitz testified as follows as to the assignment of the insurance policy:

Q Will you tell us whether this assignment of the insurance policy for $100,000 was made to replace the security of the accounts receivable which proved to be fictitious?

A No. * * * We continued to make them advances to continue them in business. Their business was to buy and process raw material, to convert it into a finished product and sell it and create a receivable. We thereby took an assignment of the receivables as consideration for additional services.

THE REFEREE: Was that the item [discovery of pre-billed accounts]

that caused you to ask for what you might call additional security?

THE WITNESS:

\*     \*     \*     \*     \*     \*

Mr. Wohl had indicated that he would need our cooperation to continue because if we suddenly stopped advancing money to him he obviously would have a problem as to how he was going to get money.

Of course, after looking over the file, insurance had been one of the items that came up. We had been doing business with Hygrade since 1955, in other words it was seven years we had been doing business with them and from the very first we had life insurance assigned to us. We had a $50,000 policy at one point and we had another $50,000 at another point. As the account grew we would ask for more insurance.

One of the $50,000 policies was a reducing term policy and worth about $20,000 in November, 1962. We had at that time $27,000 face value of life insurance.

When Mr Shulder looked at the account and saw he owed us $300,000 to $400,000, he insisted we get more life insurance and we conveyed this to Mr. Wohl.

We were going to take out a policy to cover ourselves when he said he had a policy and there was no need to incur additional premiums. The premium on $100,000 would be in the neighborhood of $1,000 and I asked him what he had and that he bring it in and we would take an assignment for it. He brought in this policy of $100,000.

\*     \*     \*     \*     \*     \*

We gave him that loan and took the mortgage and at the same time took an assignment of the life insurance policy.

■ The Court is satisfied by the pattern of previous business dealings and the testimony and other evidence that the assignment of the insurance policy was obtained in order to induce Gibraltar to make further advances in what proved to be a vain attempt to keep Hygrade going as a business enterprise. Its assignment was not, in the words of the statute "for or on account of an antecedent debt." The decision of the Referee on this issue is reversed.

## V. VALUE OF POLICY

■ Even if the policy were assigned as consideration for past debts, the trustee would not be entitled to the $101,000 proceeds of the policy but to its value at the time of assignment. The value of a preference may be determined either on the basis of the market value of the assets at the moment of the assignment or the extent of the depletion of the bankrupt's estate at that moment. Virginia National Bank v. Woodson, 329 F.2d 836, 840 (4th Cir. 1964). See also Continental & Commercial Trust & Savings Bank v. Chicago Title & Trust Co., 229 U.S. 435, 444, 33 S.Ct. 829, 57 L.Ed. 1268 (1913) (estate of bankrupt must be diminished).

■ Both these approaches require a determination of value at the time of assignment, not at the time of the contingency precipitating payment. In re P. B. McChesney & Son, 31 F.Supp. 202, 204 (W.D.Ky. 1940). Cf. In re Schindler, 223 F.Supp. 512, 529 (E.D.Mo. 1963). "The character of the transactions is to be judged at the time when they were made, not by how the collateral panned out afterwards." In re Freeman Cotting Coat Co., 212 Fed. 548, 550 (D.Mass. 1913). Where market value is used, valuation must be on the basis of what the bankrupt would be "able to obtain \* \* \* at a fair sale." Mansfield Lumber Co. v. Sternberg, 38 F.2d 614, 618 (8th Cir. 1930). Except in the case of a unique asset whose value in the hands of the bankrupt is greater than it would be in the market—and this insurance policy was not unique in that sense—the value lost by the bankrupt is the fair sale value.

At the time of transfer, the policy was no more valuable than a New York State lottery ticket a month before the drawing—even if that ticket ultimately prov-

ed to be the winning one. Cf. In re Little River Lumber Co., 92 Fed. 585, 587 (W. D.Ark. 1899) (the policy was "not assets, like notes, mortgages, and other choses in action, to which creditors could look for security. Indeed, the company could not collect them. There had been no loss, and their collection depended on the loss"). See also In re Freeman Cotting Coat Co., supra (assignee collected an excess of collateral on assigned accounts, all of which proved good). What the bankrupt lost at the moment of assignment was only what it would have then had available for distribution had it not made the transfer. There is no evidence in the record that Wohl was not in average health or that Gibraltar intended to secure Wohl's death or drive him to take his own life. The value at the time of assignment was either $393 or $1,000. The lower figure was the cash surrender value or what the policy could be sold for. The higher figure was the cost of a new policy.

In the absence of any bankruptcy cases involving valuation of life insurance policies, we look to the internal revenue laws for analogies. But cf. Burlingham v. Crouse, 228 U.S. 459, 472, 33 S.Ct. 564, 57 L.Ed. 920 (1913) (under § 70(a) of Bankruptcy Act, cash surrender value is decisive). When a taxpayer claims a loss upon the surrender of a life insurance policy, "market value" of the policy surrendered is determined. Early v. Atkinson, 175 F.2d 118, 122 (4th Cir. 1949). This is the cash surrender value. London Shoe Co. v. Commissioner, 80 F.2d 230, 233 (2d Cir. 1935), cert. denied, 298 U.S. 663, 56 S.Ct. 747, 80 L.Ed. 1388 (1936) (value of the surrendered policy was its cash surrender value inasmuch as premiums above such value were "paid to obtain the insurance protection which was for many years afforded"). See also Gravois Planing Mill Co. v. Com-

missioner, 299 F.2d 199, 211 (8th Cir. 1962) ("it was at the time worth no more than cash surrender value to [assignee] which was otherwise short of immediately needed cash"); Early v. Atkinson, supra; Arnold v. United States, 180 F. Supp. 746 (N.D.Tex. 1959). Cf. United States v. Bess, 357 U.S. 51, 55–56, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958) (lien during lifetime of beneficiary is based on cash surrender value; government cannot reach face value upon death). For gift tax purposes, where the gain to the donee is an important factor, the replacement cost of the policies is the proper value because "[t]he cost of duplicating the policies at the dates of the gifts is in the absence of more cogent evidence the one criterion which reflects both their insurance and investment value to the owner at that time." United States v. Ryerson, 312 U.S. 260, 261, 61 S.Ct. 479, 85 L.Ed. 819 (1941).

The relationship of Gibraltar to Hygrade was not that of donee and donor so that the taxpayer surrender cases rather than the gift cases seem to provide a closer analogy. The Court, therefore, finds the value of the policy at the time of assignment to be $393. The decision of the Referee on this issue is reversed.

But whether the value is $393 or $1,000, compared to the total debts owed to Gibraltar and the amounts subsequently advanced, the amount is de minimus. 3 Collier, Bankruptcy, ¶ 60.02, p. 860, n. 8 (14th Ed. 1965). Even if this assignment constituted a preference—and it does not—in the circumstances of this case, there is no necessity to set it aside.

## VI. CONCLUSION

The decision of the Referee that the proceeds of the policy in the sum of $101,000 are not recoverable, is affirmed.

So ordered.